## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Howard Nelson,<br><br>              Plaintiff,<br><br>v.<br><br>SGS North America, Inc.,<br><br>              Defendant. | Case No. 12-cv-2854 (SRN/JJG)<br><br><br>**MEMORANDUM OPINION<br>AND ORDER** |

Thomas J. Conley, Law Office of Thomas J. Conley, 80 South Eighth Street, Suite 900, Minneapolis, Minnesota 55402, for Plaintiff.

Sarah J. Gorajski, Littler Mendelson, PC, 80 South Eighth Street, Suite 1300, Minneapolis, Minnesota 55402, for Defendant.

SUSAN RICHARD NELSON, United States District Judge

## I.      INTRODUCTION

This matter is before the Court on Defendant's Motion for Summary Judgment [Doc. No. 15].  Plaintiff Howard Nelson ("Nelson") asserts three claims against his former employer, Defendant SGS North America, Inc. ("SGS North America"): (1) breach of contract, (2) promissory estoppel, and (3) violation of Minnesota Statute § 181.13.  (Compl. ¶¶ 18-22, 23-26, 27-31 [Doc. No. 1-1].)  For the reasons set forth below, the Court grants in part and denies in part Defendant's summary judgment motion, and denies Defendant's request for reasonable expenses incurred in bringing the motion.

1

II.    **BACKGROUND**

**A. The Parties**

Nelson is a former employee of SGS North America and a resident of Dakota County, Minnesota.  (Compl. ¶ 1 [Doc. No. 1-1].)  SGS North America is a Delaware corporation with its principal place of business in New Jersey.  (Id. ¶ 2; Answer ¶ 2 [Doc. No. 4].)  A leader in inspection, testing, certification, and verification services, SGS North America is comprised of ten divisions, including but not limited to its agricultural services division ("AGRI") and its oil, gas, and chemical services division ("OGC"). (Dep. of Howard Nelson at 36, 46-47, Ex. A to Decl. of Sarah J. Gorajski [Doc. No. 20-1]; Dep. of Steven Bloom at 13, Ex. C to Gorajski Decl. [Doc. No. 20-3].)

SGS North America is wholly owned by SGS S.A. ("SGS Geneva"), a Swiss company based in Geneva, Switzerland.  (Bloom Dep. at 23; Dep. of John Ashworth at 13-14, Ex. B to Gorajski Decl. [Doc. No. 20-2].)  SGS Geneva sponsors certain initiatives and positions at SGS North America, particularly when SGS Geneva seeks to expand into newer markets.  (Ashworth Dep. at 14-15.)

**B. Nelson's Employment with SGS North America**

**1.  Years 2005 through 2010**

In June 2005, Nelson began working with SGS North America's AGRI division as an Up Sourcing Sales Executive, a position funded by SGS Geneva.  (Nelson Dep. at 37, 40.)  This position generally required Nelson to find new business opportunities in North America for the AGRI division.  (Id. at 37; Position Profiling, Ex. 4 to Nelson Dep. [Doc. No. 20-1].)  Namely, Nelson was responsible for "establishing and implementing a

2

successful sales program for oilseed-complex supply chain management, and for driving and creating revenue growth for the sector." (June 8, 2005, Employment Offer Letter, Ex. 18 to Nelson Dep. [Doc. No. 20-1].)

In October 2007, Nelson transferred to a new position: Business Development Manager, Alternative Fuels Services, in SGS North America's AGRI division. (Nelson Dep. at 39, 42-43; Employment Agreement, Attach. 7 to Pl.'s Mem. in Opp'n to Mot. for Summ. J. [Doc. No. 24-7].) As Business Development Manager, Nelson was responsible for SGS North America's strategic development in the alternative fuels market, which included ethanol, bio-diesel, wind, solar, and other renewable energy sources segments. (Nelson Dep. at 41; Job Description, Ex. 5 to Nelson Dep. [Doc. No. 20-1].) Nelson reported to Paul Harrison, Vice President of Sales and Agricultural Services, based in Geneva, Switzerland. (Nelson Dep. at 45.) Nonetheless, SGS North America remained Nelson's employer. (Dec. 20, 2013, Hr'g Tr. at 4.) Funding for Nelson's salary, expenses, and bonus plan came from SGS Geneva. (Bloom Dep. at 20-22; Nelson Dep. at 40, 46.)

During negotiations for the Business Development Manager position, Nelson and Harrison discussed the structure of potential bonuses. The record contains the following evidence of such discussions.

On October 9, 2007, SGS North America executive Olivier Coppey emailed Harrison:

> Howie [Nelson] asked me a question which needs confirmation from your side. His total target is US $1.75 Mio [million] in 2008 with a break down per business line. The question of Howie is what if he does more for one

> specific business line and less for another?  In other terms, is the break-
> down per business line indicative (only the global figure will be considered
> for the bonus) or will the bonus scheme be applied per business line?

(Oct. 9, 2007, Email, Attach. 21 to Pl.'s Opp'n to Def.'s Mot. for Summ. J. at SGS-756

[Doc. No. 24-21].)  Harrison responded that "Global Figure will be the [sic] considered

for Bonus . . . If the 1.75 Mio comes from only one business he will still get his bonus."

(Id. at SGS-755.)

On October 23, 2007, SGS North America's Director of Human Resources, Steve

Bloom, questioned via email the idea that "everyone wants the part of the bonus language

requiring that the new business come directly from Howie [Nelson] removed.  Is this

wise?  He can earn quite a nice incentive on performance that had nothing to do with

him."  (Id. at SGS-755.)

On November 5, 2007, Harrison emailed Bloom and carbon copied Coppey:

> It appears that in section 4. [of the Employment Agreement] Bonus that the
> use of the word "solely" contradicts in [principle] [sic] [what] we had
> agreed on with Howie.  This position depends on crossing divisional lines
> and involves other sales/business development and bringing others into the
> sales effort.  This effort is not a solo effort, but a collaborative one.  We are
> also not able to track individually on a financial basis such results.  The
> target[s] have been set simply [based on] revenue increases per business per
> sector . . . I would like to cross out the word "solely."  Please confirm.

(Nov. 5, 2007, Email, Attach. 23 to Pl.'s Opp'n to Def.'s Mot. for Summ. J. at SGS-759

[Doc. No. 24-23].)  For unknown reasons, Bloom did not incorporate the requested

change, and the word "solely" appeared in paragraph four of the Employment

Agreement.  (Bloom Dep. at 33-34.)

Ultimately, the Employment Agreement signed by Nelson on November 6, 2007

4

included this bonus provision:

> 4. **BONUS:** For calendar year 2008, Employee's target Bonus will be 30% of his annualized base salary, subject to all applicable taxes and any necessary and authorized deductions, provided, however, that Employee must remain in the employ of the Company through the end of the calendar year for which the Bonus Program is effective and meet all of the other criteria of the Program in order to be eligible for any Bonus. The Bonus will be based on Employee's achieving One Million Seven Hundred Fifty Thousand Dollars ($1,750,000) of proven new business generated solely by Employee's efforts. Bonuses are not guaranteed and may be modulated between 0% and 250% of target depending upon regional performance. Bonuses are conditioned on achieving more than 90% of performance objectives. Every percentage point in excess of 100% performance target will be multiplied by three (3). Every percentage point below 100% target reduces the bonus by ten (10) percent. The Bonus Program is subject to review and change annually.

(Employment Agreement, Attach. 7 to Pl.'s Mem. in Opp'n to Mot. for Summ. J. ¶ 4 [Doc. No. 24-7].) The Employment Agreement also stated that it "may not be modified, changed, amended or varied in any manner by any statements, representations, warranty, or covenant except as contained in a written amendment hereto signed by both parties." (Id. ¶ 16.)

At the end of each year as Business Development Manager, Nelson submitted a bonus calculation to Harrison for approval. (Nelson Dep. at 196-97; Proposed Bonus Plans for 2008, 2009, and 2010, Exs. 22, 28, 32 to Nelson Dep. [Doc. No. 20-1].) Subsequently, SGS Geneva would approve a bonus payment, notify SGS North America of the amount to pay Nelson, and reimburse SGS North America for that cost. (Bloom Dep. at 20-21, 60, 70-71.)

### a. 2008 Bonus

Nelson based his proposed bonus calculation for 2008 on the following

methodology:

### Bonus Plan 2008 Business Development Alternative Fuels

Target Bonus = 30% of base salary (.30 x 95,000) = $28,500

Max bonus is 250% x bonus value at Target (28,500 x 2.5) = $71,250

For each 1% over target earn 3.0% x base salary (.03 x 95,000) = $2,850

(Proposed Bonus Plan for 2008, Ex. 22 to Nelson Dep. [Doc. No. 20-1].)  Nelson's

proposal was not based solely on his individual performance, but rather, accounted for

the target revenue of several divisions: "OGC," "Agri & PTO," "SSC," "Indu," and

"Other Agri."  (Id.)  Alternative Fuels Services met the target revenue for 2008, and

Nelson received a bonus of $71,250.  (Id.; Supplemental Answer to Pl.'s Interrog.

Number 3, Ex. 59 to Bloom Dep. [Doc. No. 20-3]; Nelson Dep. at 197.)

### b.  2009 Bonus

On December 4, 2008, Harrison notified Nelson by letter that his annual base

salary would increase to $99,655, and "[t]he percentage of Variable Pay – Corporate

Bonus Plan – on your Annual Base Salary remains unchanged at 30%."  (Dec. 4, 2008,

Letter, Ex. 23 to Nelson Dep. [Doc. No. 20-1].)

On June 24, 2009, Harrison notified Nelson by letter that "effective January 1,

2009, your bonus will be calculated as follows":

Your target bonus is confirmed at 30% of your annual base salary

Your bonus payout will be measured as follows:

> 70.0% Sales KPI – Increase in Alternative Fuels Revenue NAM
> USD 2.0 Mio

20.0%  Agricultural Revenue North America

10.0%  Agricultural Global Local Contribution

All of the above financial performance will be established on the basis of actual results vs budgeted results, as per Group Control approved figures.

The other part of the bonus policy remains unchanged as mentioned in the Corporate Bonus Policy.

These conditions cancel and replace any previous bonus contractual terms.

(June 24, 2009, Letter, Ex. 27 to Nelson Dep. [Doc. No. 20-1].)

Nelson based his 2009 proposed bonus calculation on the following methodology:

**Bonus Plan 2009 Business Development Alternative Fuels**

Target Bonus = 30% of base salary (.30 x 95,000) = $28,500

Max bonus is 250% x bonus value at Target (28,500 x 2.5) = $71,250

For each 1% over target earn 3.0% x base salary (.03 x 95,000) = $2,850

For 2009 Target Bonus = 30% of base sal. (.30 x 99,655) = $29,895.50 ($2,989 for each 1%)

(Proposed Bonus Plan for 2009, Ex. 28 to Nelson Dep. [Doc. No. 20-1].)  Nelson's

proposal accounted for the target revenue of several divisions: "OGC," "Agri & PTO,"

"SSC," "Indu," and "Other Agri."  (Id.)  Alternative Fuels Services did not reach the

target revenue for 2009, and Nelson earned a bonus of $5,816.  (Supplemental Answer to

Pl.'s Interrog. Number 4, Ex. 59 to Bloom Dep. [Doc. No. 20-3].)

### c.  2010 Bonus

On January 1, 2010, Steve Valvano, SGS North America's Senior Vice President

of Human Resources, and Jeff McDonald, Chief Operating Officer of SGS North

7

America, notified Nelson by letter that his salary would increase to $101,648," and "[t]he

percentage of Variable Pay – Corporate Bonus Plan – on your Annual Base Salary

remains unchanged at 30%."  (Jan. 1, 2010, Letter, Ex. 30 to Nelson Dep. [Doc. No. 20-

1].)

On January 21, 2010, Bloom emailed Marylou Russo, Accounting Manager for

SGS North America, responding to Russo's inquiry about Nelson's bonus plan for 2010.

(Jan. 21, 2010, Email, Ex. 57 to Bloom Dep. [Doc. No. 20-3].)  Bloom wrote that

Nelson's

> . . . target Bonus will be thirty percent (30%) of his annualized base salary,
> subject to all applicable taxes and any necessary and authorized deductions,
> provided, however, that Employee [Nelson] must remain in the employ of
> the Company through the end of the calendar year for which the Bonus
> Program is effective and meet all of the other criteria of the Program in
> order to be eligible for any Bonus.  The Bonus will be calculated on
> Seventy Percent (70%) Sales KPI – Increase Alternative Fuels Revenue 2
> Million, twenty percent (20%) target North America Agri Revenue, and ten
> percent (10%) target Global Agri Business LC.

(Id.)

On March 3, 2010, Nelson emailed Harrison his proposed bonus plan for 2010.

Nelson wrote:

> In addition to financial goals, I have included some non financial objectives
> as a percentage of target bonus.  You will need to determine how the
> additional bonus payout will be measured.  I've included the chart that
> bases 100% of the financial bonus payout on sales increase in alternative
> fuels revenue as we did in 2008.
>
> Is target bonus still at 30% of salary?

(Mar. 3, 2010, Email, Ex. 33 to Nelson Dep. [Doc. No. 20-1].)  Nelson based his 2010

proposed bonus calculation on the following methodology:

8

**Bonus Plan 2010 Business Development Alternative Fuels
Non Financial Objectives for 2010**

Coordinate and exhibit/attend a minimum of 5 alternative fuels/agricultural
conferences

Make a minimum of 100 business contacts/month or 1200 total per year

Report detail activities on a monthly basis to Geneva

Manage within assigned budget

When all non financial objectives are met 30% of target bonus will be
earned ($9,148)

**Financial Bonus Calculations**

Bonus will be determined on the total of all business line growth targets
($1,750,000)

Target Bonus = 30% of base salary (.30 x $101,648) = $30,494

Max bonus is 250% x bonus value at Target (30,494 x 2.5) = $76,236

For each 1% over target earn 3.0% x base salary (.03 x 101,648) = $3,049

(Proposed Bonus Plan for 2010, Ex. 32 to Nelson Dep. [Doc. No. 20-1].)  Nelson's

proposal accounted for the revenue of several divisions: "AGRI," "ENV," "IND," "SSC,"

"MIN," and "OGC."  (Id.)

Alternative Fuels Services did not reach the proposed financial target for 2010.

(Jan. 14, 2011, Email, Ex. 35 to Nelson Dep. [Doc. No. 20-1].)  Nonetheless, Nelson

received a bonus of $11,065, which included a payment for meeting his non-financial

objectives and a discretionary payout of $1,917.  (Apr. 4, 2011, Letter, Ex. 36 to Nelson

Dep. [Doc. No. 20-1]; Supplemental Answer to Pl.'s Interrog. Number 5, Ex. 59 to

Bloom Dep. [Doc. No. 20-3].)

### 2.  Year 2011 until Nelson's Termination

In January 2011, SGS Geneva stopped funding Nelson's position, and SGS North America's AGRI and OGC divisions inherited the position.  (Nelson Dep. at 46-47; Ashworth Dep. at 17.)  Nelson began reporting to Bernardo Nogueira, AGRI Senior Vice President, and Shane Jenkins, OGC North America Chemicals Manager.  (Nelson Dep. at 46-48.)  Jenkins in turn reported to John Ashworth, OGC Vice President of Sales and Marketing.  (Id. at 48.)  Nelson continued working in the alternative fuels segment, but his duties became more tailored to services offered by the OGC and AGRI divisions.  (Id. at 50-59.)

SGS North America remained Nelson's employer.  (Dec. 20, 2013, Hr'g Tr. at 21.)  Ashworth was not aware of any letter provided to Nelson in connection with the transition, or any new employment agreement between Nelson and SGS North America. (Ashworth Dep. at 17-18.)  Ashworth did not know of any documents suggesting that the 2007 Employment Agreement no longer applied to Nelson, and neither he nor Jenkins had any conversations with Nelson to that effect.  (Id. at 19-20, 53.)  When asked why he thought the 2007 Employment Agreement was no longer in effect in 2011, Ashworth stated:

> [T]he agreement that was in place—to me it was not pertinent whether there was an agreement and, you know, what transpired in the past I was not up to speed on because when he [Nelson] came into our group, my expectation was that we—you know, that that would not apply.

(Id. at 52-53.)

### a.  AGRI and OGC Bonus Plans

In early 2011, Nelson approached Nogueira and Jenkins separately to discuss his

performance objectives and negotiate two bonus plans: one with AGRI and one with

OGC.  (Nelson Dep. at 49, 82-85, 162-64.)  Nogueira approved a 2011 AGRI bonus plan,

(id. at 114, 164), which provided that Nelson's AGRI bonus would be based on an AGRI

revenue growth target of $570,000.  (Id. at 175.)  With respect to "QA Testing – Ethanol

Industry," documents state that a "clear link between activity and the sale person is

needed."  (Jan. 17, 2012, Email, Ex. 17 to Nelson Dep. at Nelson-0059 [Doc. No. 20-1].)

It was also agreed that the target bonus would be proportionate to the percentage of time

that Nelson dedicated to AGRI.  (Nelson Dep. at 167.)

Nelson believes that during his initial meeting with Ashworth on January 19,

2011, Nelson raised the issue of a 2011 bonus plan with OGC.  (Id. at 141-43.)  Nelson

does not remember if Ashworth gave him any information about a bonus plan at this

time.  (Id. at 142.)

On April 5, 2011, Nelson and Jenkins met to discuss Nelson's OGC performance

objectives for 2011.  (Dep. of Shane Jenkins at 12, Ex. D to Decl. of Sarah J. Gorajski

[Doc. No. 20-4].)  Both signed an Objective Setting Form that identified Nelson's non-

financial and financial objectives for the year.[1]  (Objective Setting Form, Ex. 7 to Nelson

Dep. [Doc. No. 20-1].)  This Objective Setting Form was the same form used by Nelson

to determine his bonus in 2008, 2009, and 2010.  (Dec. 20, 2013, Hr'g Tr. at 22.)

---

[1]  Nelson understood that when Jenkins signed the Objective Setting Form, he was
approving Nelson's 2011 OGC bonus plan.  (Nelson Dep. at 119-20.)

Financial objectives included revenue targets for the methane testing, ethanol, and biodiesel markets, as well as an overall team target revenue goal of $2,436,292. (Id.) Nelson initially proposed a higher team revenue target, but Jenkins reduced the target to make it more achievable. (Nelson Dep. at 91; Jenkins Dep. at 23-24.) Nelson testified that Jenkins reduced the target in order for Nelson to earn a bonus, allegedly telling Nelson that "we want you to achieve your goal so that you can . . . receive the bonus that you deserve." (Nelson Dep. at 91-92.) Nelson also testified that Jenkins specifically told him that if he met his goals and objectives, he would receive a bonus for 2011. (Id. at 78-79.) Jenkins, however, denies making any such representations:

> Q:      . . . when you spoke with Howie, did you discuss changing any targets with respect to any proposed bonus plan?
>
> A:      No.
>
> Q:      At any time when you were speaking with Mr. Nelson about the goals on the objective setting form, which is Exhibit 7, at any time did you indicate that if he met any of those goals that he would be eligible for a bonus for 2011?
>
> A:      No.

(Jenkins Dep. at 45-46.) Jenkins also recalls telling Nelson at this meeting that Nelson did not have a bonus plan with OGC for 2011. (Id. at 10.)

On April 6, 2011, Nelson emailed Jenkins a proposed OGC bonus plan for 2011. (Proposed Bonus Plan for 2011, Ex. 6 to Nelson Dep. [Doc. No. 20-1].) Nelson based his bonus calculation on the following methodology:

**Bonus Plan 2011 Business Development Alternative Fuels
Non Financial Objectives for 2011**

Coordinate and exhibit/attend a minimum of 3 alternative fuels conferences

Make a minimum of 40 business contacts/month or 480 total per year and
promptly log into CRM

Report detail activities on a monthly basis to Shane Jenkins

When all non financial objectives are met 30% of target bonus will be
earned ($9,331)

**Financial Bonus Calculations**

Bonus will be determined on the total of all business line growth targets =
$487,500

Target Bonus = 30% of base salary (.30 x $103,680) = $31,104

Max bonus is 250% x bonus value at Target (31,104 x 2.5) = $77,760

For each 1% over target earn 3.0% x base salary (.03 x 103,680) = $3,110

(Proposed Bonus Plan for 2011, Ex. 6 to Nelson Dep. [Doc. No. 20-1].)  Nelson's

proposal accounted for the target revenue of several OGC business sectors: "Lab

Ethanol," "Lab BioDiesel," "Lab Methane," "Lab Total," "Field Ethanol," "Field

BioDiesel," "Tank Strapping," Field Total," "Cargo Treatment," "PTO," and "Canada."

(Id.)  After receiving Nelson's email, Jenkins recalls telling Nelson that he did not have a

bonus plan for 2011 with OGC, and that Jenkins needed to send the proposal to Ashworth

and Human Resources for approval.  (Jenkins Dep. at 11-12.)

On April 10, 2011, Ashworth emailed Jenkins, indicating that Nelson

. . . will be participating under the same bonus program as all of our BD
[business development] personnel.  Please align him with assigned goals
and objectives for the coming quarter.  We will be carefully measuring his

13

> interaction and participation specific to the accounts listed on the excel as
> to his effectiveness.

(Apr. 10, 2011, Letter, Ex. 60 to Jenkins Dep. [Doc. No. 20-4].)  Jenkins understood the

email to mean that Ashworth wanted Nelson to be part of the same bonus program as the

other business development personnel in 2011.  (Jenkins Dep. at 15-16.)

On April 15, 2011, Jenkins forwarded Nelson's April 6, 2011, email to Ashworth.

(Apr. 15, 2011, Email, Ex. 50 to Ashworth Dep. [Doc. No. 20-2].)  After this point,

Jenkins was no longer involved with the determination of any 2011 bonus plan for

Nelson.  (Jenkins Dep. at 13.)  Neither Jenkins nor Ashworth informed Nelson that he

was not eligible for a 2011 bonus with OGC.  (Id. at 14; Ashworth Dep. at 32.)

### b.  Nelson Seeks 2011 OGC Bonus[2]

By the end of 2011, Nelson met his non-financial OGC objectives, but not all of

his financial objectives, for the year.  (Nelson Dep. at 70-72.)  OGC met its overall

performance goals for 2011.  (Id. at 77.)

On January 11, 2012, Nelson reported to Jenkins via email that in 2011, OGC

received $3,332,037 in overall revenue for Alternative Fuels Services—an improvement

from the $1,948,784 received in 2010.  (Mar. 22, 2012, Email, Ex. 1 to Nelson Dep. at

SGS-0370, -0371 [Doc. No. 20-1].)  Nelson wrote, "This blows the roof off the agreed

target goal of 25% increase and maximizes the bonus earned."  (Id. at SGS-0371.)  Using

the methodology set forth in his April 6, 2011, email to Jenkins, Nelson sought a bonus

of $9,331 for meeting his non-financial OGC objectives, and $77,760 for OGC meeting

---

[2]  Nelson does not claim that the AGRI division owed him a bonus for 2011.  (Nelson
Dep. at 61.)

its overall target revenue.  (Id. at SGS-0370.)

Nelson received no response to his January 11, 2012, email to Jenkins, and sent a reminder email on January 25, 2012.  (Jan. 31, 2012, Email, Ex. 51 to Ashworth Dep. [Doc. No. 20-2].)  On January 31, 2012, Jenkins forwarded the reminder email to Ashworth and copied Kathy Mills, an employee in SGS Human Resources.  (Id.)

On March 16, 2012, Ashworth arranged for a conference call with Nelson, Nogueira, and Mills.  (Ashworth Dep. at 38.)  During this call, Ashworth explained that OGC would no longer fund the alternative fuels initiative because it had not provided the expected financial value.  (Id. at 38-39.)  Ashworth also informed Nelson that he was not entitled to an OGC bonus for 2011.  (Nelson Dep. at 159.)  On this call, Nogueira offered Nelson a Regional Sales Development Manager position, reporting full-time to the AGRI division.  (Id. at 158.)  Nelson accepted this position, which took effect on April 1, 2012. (Id. at 245-46; Mar. 17, 2012, Email, Ex. 42 to Nelson Dep. [Doc. No. 20-1].)  SGS North America remained Nelson's employer through this transition.  (Nelson Dep. at 235-36.)

On March 22, 2012, Nelson emailed Ashworth, requesting a reconsideration of the decision to deny Nelson a 2011 OGC bonus.  (Mar. 22, 2012, Email, Ex. 1 to Nelson Dep. [Doc. No. 20-1].)  Nelson did not receive any response to this email.  (Nelson Dep. at 161.)

Based on Nelson's understanding that he was eligible for a 2011 bonus with OGC, Nelson remained employed with SGS North America until July 3, 2012, and "worked extremely hard to achieve it [the bonus] as indicated by the numbers."  (Nelson Dep. at

15

233, 247; July 3, 2012, Termination Letter, Ex. 43 to Nelson Dep. [Doc. No. 20-1].)

Nelson testified:

> Q:      Other than working hard, is there any other action that you took
> because you thought that Shane [Jenkins] was promising you a bonus for
> 2011?
>
> A:      Other action.  I didn't operate outside of any, no, I would say no.
>
> Q:      Did you have any plans to leave SGS in 2011?
>
> A:      No.
>
> Q:      Did you have any plans to voluntarily leave SGS in 2012?
>
> A:      Involuntarily to begin with from OGC, it was determined on that
> conference call that I couldn't be, wouldn't be used in OGC any longer.  So
> yeah, it was, at that point is when I was informed that I was no longer
> needed there, and so then it's now we're starting up with AGRI.  And at
> that point I'm beginning to wonder if this is a set-up . . . but I kept going.  I
> didn't make any changes, I just kept working hard, kept my nose down.

(Nelson Dep. at 234.)

## III.    DISCUSSION

### A.    Summary Judgment

#### 1.    Standard of Review

Summary judgment is appropriate "if the pleadings, the discovery and disclosure

materials on file, and any affidavits show that there is no genuine issue as to any material

fact and that the movant is entitled to judgment as a matter of law."  FED. R. CIV. P.

56(c).  A dispute over a fact is "material" only if its resolution might affect the outcome

of the suit under the governing substantive law.  Anderson v. Liberty Lobby, Inc., 477

U.S. 242, 248 (1986).  A dispute over a fact is "genuine" only if the evidence is such that

a reasonable jury could return a verdict for the non-moving party.  (Id.)  In considering a

motion for summary judgment, the court views the evidence and the inferences that may

be reasonably drawn from the evidence in the light most favorable to the nonmoving

party.  Khoury v. Group Health Plan, Inc., 615 F.3d 946, 952 (8th Cir. 2010).  The

moving party bears the burden of showing that there is no genuine issue of material fact

and that it is entitled to judgment as a matter of law.  (Id.)  The party opposing a properly

supported motion for summary judgment may not rest on mere allegations or denials, but

must set forth specific facts in the record showing that there is a genuine issue for trial.

(Id.)

### 2.      Breach of Contract

To prevail on a claim for breach of contract, a plaintiff must show: (1) formation of a

contract; (2) performance by the plaintiff of any conditions precedent; (3) material breach of

the contract by the defendant; and (4) damages.  Parkhill v. Minnesota Mut. Life Ins. Co.,

174 F. Supp. 2d 951, 961 (D. Minn. 2000).  Nelson alleges that: (1) the parties had an

enforceable contract providing for the payment of certain bonuses to Nelson; (2) Defendant

paid Nelson a bonus under their agreement in 2008, 2009, and 2010; (3) Nelson was eligible

for a 2011 bonus in the amount of $87,091; (4) Defendant breached the contract by refusing

to pay a bonus for 2011; and (5) Nelson has been damaged by this breach.  (Compl. ¶¶ 18-

22 [Doc. No. 1-1].)

Defendant argues that Nelson's breach-of-contract claim fails because Nelson cannot

show the formation of any contract obligating Defendant to pay him a bonus for 2011.

(Mem. of Law in Supp. of Def.'s Mot. for Summ. J. at 19 [Doc. No. 17].)  Defendant

elaborates that: (1) OGC management never approved a bonus plan with Nelson; (2) the bonus provision of the 2007 Employment Agreement limits its applicability to "calendar year 2008" only; (3) the parties' actions did not indicate that the bonus provision of the 2007 Employment Agreement obligated Defendant to pay Nelson a 2011 OGC bonus; (4) Nelson's reporting and compensation structure changed significantly from 2007 to 2011; and (5) Nelson's individual performance did not meet his 2011 goals for OGC.  (Id. at 20-23.)  Plaintiff responds that the 2007 Employment Agreement contemplated bonuses after 2008, and the parties' course of conduct shows that this agreement remained in effect for 2011.  (Pl.'s Mem. in Opp'n to Mot. for Summ. J. at 11-14 [Doc. No. 24].)

Minnesota law recognizes express contracts formed by writing, oral agreement, conduct, or through a combination of means.  Joseph v. Edeskuty & Assocs. v. Jacksonville Kraft Paper Co., Inc., 702 F. Supp. 741, 747 (D. Minn. 1988).  "A fact finder may infer the existence of a contract from the circumstances and conduct of the parties."  Id.

The Court concludes that there are genuine issues of material fact regarding the formation of a contract—that is, whether there was any agreement obligating Defendant to pay Nelson a 2011 OGC bonus.  These disputed issues of fact are set forth below.

### a.  Whether the bonus provision in the 2007 Employment Agreement was limited to 2008

First, it is disputed whether the bonus provision in the 2007 Employment Agreement was limited to the 2008 year.  This provision states:

> 4.  **BONUS:** For calendar year 2008, Employee's target Bonus will be 30% of his annualized base salary, subject to all applicable taxes and any necessary and authorized deductions, provided, however, that Employee must remain in the employ of the Company through the end of the calendar

year for which the Bonus Program is effective and meet all of the other
criteria of the Program in order to be eligible for any Bonus.  The Bonus
will be based on Employee's achieving One Million Seven Hundred Fifty
Thousand Dollars ($1,750,000) of proven new business generated solely by
Employee's efforts.  Bonuses are not guaranteed and may be modulated
between 0% and 250% of target depending upon regional performance.
Bonuses are conditioned on achieving more than 90% of performance
objectives.  Every percentage point in excess of 100% performance target
will be multiplied by three (3).  Every percentage point below 100% target
reduces the bonus by ten (10) percent.  The Bonus Program is subject to
review and change annually.

(Employment Agreement, Attach. 7 to Pl.'s Mem. in Opp'n to Mot. for Summ. J. ¶ 4

[Doc. No. 24-7].)  Although paragraph four identifies "calendar year 2008" and describes

the bonus for 2008, it also contemplates an unspecified "end of the calendar year for

which the Bonus Program is effective."  (Id.)  The final sentence of this paragraph ("The

Bonus Program is subject to review and change annually") also suggests a more general

application of the bonus provision beyond the 2008 year.  (Id.)

Moreover, correspondence from Defendant in subsequent years refers to the bonus

provision in the 2007 Employment Agreement.  In 2009, Defendant notified Nelson that

effective January 1, 2009, Nelson's "target bonus is confirmed at 30% of your [Nelson's]

annual base salary."  (June 24, 2009, Letter, Ex. 27 to Nelson Dep. [Doc. No. 20-1].)

This same letter referred to the "Corporate Bonus Policy," which Nelson maintains is in

the 2007 Employment Agreement.  (Dec. 20, 2013, Hr'g Tr. at 18-19.)  Similarly, in

2010, Defendant notified Nelson that the "percentage of Variable Pay – Corporate Bonus

Plan – on your Annual Base Salary remains unchanged at 30%."  (Jan. 1, 2010, Letter,

Ex. 30 to Nelson Dep. [Doc. No. 20-1].)  Defendant also parroted part of the language in

the 2007 Employment Agreement, when responding to an accounting manager's inquiry

about Nelson's bonus plan for 2010:

> [Nelson's] target Bonus will be thirty percent (30%) of his annualized base salary, subject to all applicable taxes and any necessary and authorized deductions, provided, however, that Employee must remain in the employ of the Company through the end of the calendar year for which the Bonus Program is effective and meet all of the other criteria of the Program in order to be eligible for any Bonus.

(Jan. 21, 2010, Email, Ex. 57 to Bloom Dep. [Doc. No. 20-3].)

Further, with respect to his financial objectives, Nelson based his proposed bonus calculations for 2008, 2009, 2010, and 2011 on the same methodology set forth in the 2007 Employment Agreement:

**Bonus Plan 2008 Business Development Alternative Fuels**

Target Bonus = 30% of base salary (.30 x 95,000) = $28,500

Max bonus is 250% x bonus value at Target (28,500 x 2.5) = $71,250

For each 1% over target earn 3.0% x base salary (.03 x  95,000) = $2,850

(Proposed Bonus Plan for 2008, Ex. 22 to Nelson Dep. [Doc. No. 20-1].)

**Bonus Plan 2009 Business Development Alternative Fuels**

Target Bonus = 30% of base salary (.30 x 95,000) = $28,500

Max bonus is 250% x bonus value at Target (28,500 x 2.5) = $71,250

For each 1% over target earn 3.0% x base salary (.03 x 95,000) = $2,850

For 2009 Target Bonus = 30% of base sal. (.30 x 99,655) = $29,895.50 ($2,989 for each 1%)

(Proposed Bonus Plan for 2009, Ex. 28 to Nelson Dep. [Doc. No. 20-1].)

**Bonus Plan 2010 Business Development Alternative Fuels
. . . Financial Bonus Calculations**

Target Bonus = 30% of base salary (.30 x $101,648) = $30,494

Max bonus is 250% x bonus value at Target (30,494 x 2.5) = $76,236

For each 1% over target earn 3.0% x base salary (.03 x 101,648) = $3,049

(Proposed Bonus Plan for 2010, Ex. 32 to Nelson Dep. [Doc. No. 20-1].)

**Bonus Plan 2011 Business Development Alternative Fuels
. . . Financial Bonus Calculations**

Target Bonus = 30% of base salary (.30 x $103,680) = $31,104

Max bonus is 250% x bonus value at Target (31,104 x 2.5) = $77,760

For each 1% over target earn 3.0% x base salary (.03 x 103,680) = $3,110

(Proposed Bonus Plan for 2011, Ex. 6 to Nelson Dep. [Doc. No. 20-1].)  These proposals

all calculate "target bonus," "max bonus," and "each 1% over target" in the same manner.

The Court additionally notes Nelson's inquiry to Harrison about his proposed bonus for

2010: "I've included the chart that bases 100% of the financial bonus payout on sales

increase in alternative fuels revenue as we did in 2008 . . . Is target bonus still at 30% of

salary?"  (Mar. 3, 2010, Email, Ex. 33 to Nelson Dep. [Doc. No. 20-1].)  Such language

suggests that like Defendant, Nelson referred to the 2007 Employment Agreement's

bonus provision to calculate his bonus for subsequent years.

Finally, the 2007 Employment Agreement contains a provision on amendments.

(Employment Agreement, Attach. 7 to Pl.'s Mem. in Opp'n to Mot. for Summ. J. ¶ 16

[Doc. No. 24-7].)  Paragraph 16 states in part:

This Agreement sets forth the entire understanding between the parties.

> This Agreement may not be modified, changed, amended or varied in any manner by any statements, representations, warranty, or covenant except as contained in a written amendment hereto signed by both parties.

(Id.)  The record does not contain any written amendment signed by both parties.[3]  And, Defendant was not aware of any new employment agreement between Nelson and SGS North America in connection with Nelson's transition in 2011.  (Ashworth Dep. at 17-18.)  Ashworth did not know of any documents suggesting that the 2007 Employment Agreement no longer applied to Nelson, and neither he nor Jenkins had any conversations with Nelson to that effect.  (Ashworth Dep. at 19-20, 53.)  Thus, a reasonable jury could find that the terms and substance of the 2007 Employment Agreement remained intact.

All of these facts, when viewed in the light most favorable to Nelson, the non-moving party, create a genuine issue of material fact as to whether the bonus provision in the 2007 Employment Agreement applied beyond 2008, and specifically, to 2011.

### b. Whether the parties reached an agreement about a 2011 OGC bonus plan for Nelson on April 5, 2011

Another genuine issue of material fact is whether the parties agreed on a 2011 OGC bonus plan for Nelson on April 5, 2011.  On April 5, 2011, Nelson and Jenkins met to discuss Nelson's OGC performance objectives for 2011.  (Jenkins Dep. at 12.)  They signed an Objective Setting Form, which set forth an overall team target revenue goal of $2,436,292, as they had done in prior years.  (Objective Setting Form, Ex. 7 to Nelson Dep. [Doc. No. 20-1].)  Nelson initially proposed a higher team revenue target, but Jenkins

---

[3]  To the extent that Defendant argues that its letters, dated June 24, 2009 and January 21, 2010, amend the bonus provision in the 2007 Employment Agreement, the Court notes that Nelson did not sign these documents.  (June 24, 2009, Letter, Ex. 27 to Nelson Dep. [Doc. No. 20-1]; Jan. 21, 2010, Email, Ex. 57 to Bloom Dep. [Doc. No. 20-3].)

reduced the target to make it more achievable.  (Nelson Dep. at 91; Jenkins Dep. at 23-24.)

Nelson testified that Jenkins reduced the target in order for Nelson to earn a bonus,

allegedly telling Nelson that "we want you to achieve your goal so that you can . . .

receive the bonus that you deserve."  (Nelson Dep. at 91-92.)  Nelson also testified that

Jenkins specifically told him that if he met his goals and objectives, he would receive a

bonus for 2011.  (Id. at 78-79.)  Jenkins, however, denies making any such

representations:

> Q:      . . . when you spoke with Howie, did you discuss changing any
> targets with respect to any proposed bonus plan?
>
> A:      No.
>
> Q:      At any time when you were speaking with Mr. Nelson about the
> goals on the objective setting form, which is Exhibit 7, at any time did you
> indicate that if he met any of those goals that he would be eligible for a
> bonus for 2011?
>
> A:      No.

(Jenkins Dep. at 45-46.)  Jenkins recalls telling Nelson at this meeting that Nelson did not

have a bonus plan with OGC for 2011.  (Jenkins Dep. at 10.)  Given these facts, the Court

finds a genuine issue of material fact as to whether the parties agreed on a 2011 OGC

bonus for Nelson at this meeting.

### c.  Whether Defendant approved a 2011 OGC bonus plan for Nelson

Similarly, whether Defendant approved a 2011 OGC bonus plan for Nelson is a

genuine issue of material fact.  Nelson understood that Jenkins agreed to such a bonus

plan at the April 5, 2011, meeting, when both Nelson and Jenkins signed the Objective

Setting Form.  (Nelson Dep. at 119-20; Objective Setting Form, Ex. 7 to Nelson Dep.

[Doc. No. 20-1].)  Nelson assumed that Jenkins had the authority to set Nelson's goals

and objectives, as well as his bonus plan.  (Nelson Dep. at 93.)  Jenkins, however, recalls

telling Nelson that Jenkins needed to send Nelson's 2011 OGC bonus proposal to

Ashworth and Human Resources for approval.  (Jenkins Dep. at 12.)  After Nelson

submitted a finalized proposal of his 2011 bonus plan to Jenkins on April 6, 2011,

Jenkins in turn forwarded it to Ashworth on April 15, 2011.  (Apr. 6, 2011, Email, Ex. 6

to Nelson Dep. [Doc. No. 20-1]; Apr. 15, 2011, Email, Ex. 50 to Ashworth Dep. [Doc.

No. 20-2].)  Subsequently, neither Jenkins nor Ashworth informed Nelson that he was not

eligible for a 2011 bonus with OGC.  (Jenkins Dep. at 14; Ashworth Dep. at 32.)  These

facts raise a genuine issue of material fact as to whether Defendant, via Jenkins, approved

a 2011 bonus plan with OGC for Nelson.

### d.  Whether Nelson's bonus for 2008 was based on his individual efforts or collective efforts across divisional lines

Finally, there is a genuine issue of material fact about whether the basis of

Nelson's bonus for 2008 was limited to his individual efforts, or a combination of his

individual efforts and collective efforts to reach target revenues.  This question matters

because Nelson argues that the 2007 Employment Agreement applies not only to the

2008 bonus, but also to the subsequent bonuses for 2009 through 2011.  (Dec. 20, 2013,

Hr'g Tr. at 20, 23.)

Defendant notes that the bonus provision in the 2007 Employment Agreement ties

bonus eligibility to individual performance: "The Bonus will be based on Employee's

24

achieving One Million Seven Hundred Fifty Thousand Dollars ($1,750,000) of proven

new business generated solely by Employee's efforts."  (Mem. of Law in Supp. of Def.'s

Mot. for Summ. J. at 21 [Doc. No. 17]; Employment Agreement, Attach. 7 to Pl.'s Mem.

in Opp'n to Mot. for Summ. J. ¶ 4 [Doc. No. 24-7].)

 Nelson, however, submits strong evidence suggesting that Defendant considered

collective efforts across divisional lines in determining Nelson's bonus for 2008.  For

example, on October 9, 2007, Harrison stated to Coppey that the "Global Figure will be

[sic] considered for [the 2008] Bonus."  (Oct. 9, 2007, Email, Attach. 21 to Pl.'s Opp'n to

Def.'s Mot. for Summ. J. at SGS-756 [Doc. No. 24-2].)  Also, Harrison's November 5,

2007, email to Bloom reflects Harrison's request and reasoning to delete the word

"solely" from the bonus provision:

> It appears that in section 4. [of the Employment Agreement] Bonus that the
> use of the word "solely" contradicts in [principle] [sic] [what] we had
> agreed on with Howie.  This position depends on crossing divisional lines
> and involves other sales/business development and bringing others into the
> sales effort.  This effort is not a solo effort, but a collaborative one.  We are
> also not able to track individually on a financial basis such results.  The
> target[s] have been set simply [based on] revenue increases per business per
> sector . . . I would like to cross out the word "solely."  Please confirm.

(Nov. 5, 2007, Email, Attach. 23 to Pl.'s Opp'n to Def.'s Mot. for Summ. J. at SGS-759

[Doc. No. 24-23].)  For unknown reasons, Bloom did not incorporate the requested

change, and the word "solely" appears in paragraph four of the 2007 Employment

Agreement.  (Bloom Dep. at 33-34.)  Nelson proposed a bonus calculation for 2008 based

on the target revenue of several divisions, and he received the maximum bonus

requested.[4]  (Proposed Bonus Plan for 2008, Ex. 22 to Nelson Dep. [Doc. No. 20-1];

Supplemental Answer to Pl.'s Interrog. Number 3, Ex. 59 to Bloom Dep. [Doc. No. 20-

3].)  This evidence creates a genuine issue of material fact about the basis for calculating

the 2008 bonus, and his bonus for the years 2009 and 2010.

For all of these reasons, the Court denies Defendant's motion for summary

judgment on Nelson's breach-of-contract claim.

### 3.      Promissory Estoppel

Alternatively, Nelson seeks to recover the 2011 OGC bonus allegedly owed to him

under the doctrine of promissory estoppel.  (Compl. ¶¶ 23-26 [Doc. No. 1-1]; Pl.'s Mem. in

Opp'n to Mot. for Summ. J. at 14-15 [Doc. No. 24].)  Promissory estoppel requires proof

that: (1) a clear and definite promise was made; (2) the promisor intended to induce reliance

and the promisee in fact relied to his detriment, and (3) the promise must be enforced to

prevent injustice."  Waters v. Cafesjian, 946 F. Supp. 2d 876, 882 (D. Minn. 2013) (citing

Martens v. Minn. Mining & Mfg. Co., 616 N.W.2d 732, 746 (Minn. 2000)).

Defendant argues that the claim for promissory estoppel fails because: (1) Nelson

cannot show a clear and definite promise that Defendant did not fulfill, or any detrimental

reliance on such a promise; and (2) enforcement is not required to prevent an injustice

because Defendant never approved Nelson's proposed bonus plan for 2011, and Defendant

did not receive much benefit from Nelson's employment in 2011.  (Mem. of Law in Supp.

---

[4]  Likewise, Nelson's proposed bonus calculations for 2009 and 2010 accounted for the
target revenue of several divisions.  (Proposed Bonus Plans for 2009 and 2010, Exs. 28
and 32 to Nelson Dep. [Doc. No. 20-1].)  For 2011, Nelson's proposed bonus calculation
accounted for the target revenue of several OGC business sectors.  (Proposed Bonus Plan
for 2011, Ex. 6 to Nelson Dep. [Doc. No. 20-1].)

of Def.'s Mot. for Summ. J. at 24-28 [Doc. No. 17]; Reply Mem. in Supp. of Def.'s Mot. for

Summ. J. at 11-13 [Doc. No. 26].)  Without citing to the record, Nelson contends that all

elements of the claim are met:

> First, Jenkins made a clear and definite promise to him regarding his eligibility for
> and the calculation of his bonus.  Second, Nelson relied on that promise to his
> detriment; had he known that he was not eligible for a bonus, he would have
> considered other employment opportunities.  Finally, there is clear injustice
> present.  OGC met its revenue goals, and Nelson seeks only to be treated in the
> same fashion that he was treated in his previous three years with SGS NA.
> Moreover, he made repeated attempts to confirm the terms of his bonus, and was
> ignored each time.  It would be unjust for SGS NA to be permitted to obtain the
> benefits of Nelson's employment during 2011 while deliberately misleading him
> about his eligibility for a bonus.

(Pl.'s Mem. in Opp'n to Mot. for Summ. J. at 14-15 [Doc. No. 24].)

Regardless of whether Nelson has established the other elements, he cannot

establish the second element of a promissory estoppel claim: detrimental reliance.

Detrimental reliance requires "an actual change in the employee's position," or at least a

showing that the employee declined a lucrative opportunity or job offer in reliance on the

promise.  See Waters, 946 F. Supp. 2d at 882.  After understanding that he was eligible

for a 2011 bonus with OGC, Nelson remained employed with SGS North America until

his termination and "worked extremely hard to achieve it [the bonus] as indicated by the

numbers."  (Nelson Dep. at 233, 247.)  Nelson testified:

> Q:    Other than working hard, is there any other action that you took
> because you thought that Shane [Jenkins] was promising you a bonus for
> 2011?
>
> A:    Other action.  I didn't operate outside of any, no, I would say no.
>
> Q:    Did you have any plans to leave SGS in 2011?

A:      No.

Q:      Did you have any plans to voluntarily leave SGS in 2012?

A:      Involuntarily to begin with from OGC, it was determined on that
conference call that I couldn't be, wouldn't be used in OGC any longer.  So
yeah, it was, at that point is when I was informed that I was no longer
needed there, and so then it's now we're starting up with AGRI.  And at
that point I'm beginning to wonder if this is a set-up . . . but I kept going.  I
didn't make any changes, I just kept working hard, kept my nose down.

(Nelson Dep. at 234.)  Because Nelson simply maintained the status quo, his promissory

estoppel claim fails for lack of detrimental reliance.  Accordingly, the Court grants

Defendant's motion for summary judgment on this claim.

### 4.      Minnesota Statute § 181.13

Minnesota Statute § 181.13 provides that an employer is in default if a terminated

employee's earned wages are not paid within twenty-four hours of demand for payment.

MINN. STAT. § 181.13(a).  It further permits recovery by the employee of "average daily

earnings at the employee's regular rate of pay or the rate required by law, whichever rate

is greater, for each day up to 15 days, that the employer is in default."  Id.  An earned

bonus constitutes wages "[w]hen an employee contracts for a bonus in exchange for his

services to the employer, and the right to that bonus vests prior to the employee's

termination."  Kvidera v. Rotation Eng'g and Mfg. Co., 705 N.W.2d 416, 423 (Minn. Ct.

App. 2005).

Defendant argues that the Section 181.13 claim fails because Nelson had no

contractual right to a 2011 bonus for OGC, and therefore cannot identify any earned and

unpaid wages under this statute.  (Mem. of Law in Supp. of Def.'s Mot. for Summ. J. at

29 [Doc. No. 17].)  Nelson responds that Section 181.13 applies because he had a contractual right to a 2011 OGC bonus, based on the 2007 Employment Agreement and the course of conduct between him and Defendant from 2008 through 2010.  (Pl.'s Mem. in Opp'n to Mot. for Summ. J. at 15 [Doc. No. 24].)

As previously discussed, there are genuine issues of material fact concerning whether Nelson is entitled to a 2011 OGC bonus.  Supra Part III(A)(2).  These issues inform whether Defendant is in default for refusing to pay such a bonus.  Just as the Court denied summary judgment on the breach-of-contract claim, it denies summary judgment on the Section 181.13 claim as well.

### B.    Request for Reasonable Expenses

Defendant moves for an award of reasonable expenses incurred in bringing this summary judgment motion.  (Def.'s Mot. for Summ. J. at 1 [Doc. No. 15].)  Because Defendant has neither prevailed on the entirety of its motion, nor cited any authority supporting such an award, the Court denies the request.

## IV.   ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendant's Motion for Summary Judgment [Doc. No. 15] is **GRANTED IN PART** and **DENIED IN PART**, consistent with this Order.

2. Defendant's request for an award of reasonable expenses incurred in bringing this summary judgment motion is **DENIED**.

3. This case will be set for trial on this Court's October 20, 2014, trial calendar.  A separate Order to that effect will follow.

Dated:      June 17, 2014                    s/ Susan Richard Nelson
                                             SUSAN RICHARD NELSON
                                             United States District Court Judge